STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

NICHOLAS M. PARKER (CABN 297860)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7368
    Fax: (415) 436-7234
    Nicholas.Parker3@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:22-MJ-71287 MAG |
| Plaintiff, | MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR DETENTION |
| v. | Hearing Date: November 22, 2022<br>Hearing Time: 10:30 a.m.<br>Courtroom: 14 (18th Floor)<br>Judge: Hon. Alex G. Tse |
| MELVIN ALEXIS DIAZ ARTEAGA, | |
| Defendant. | |

## I.    INTRODUCTION

On November 16, 2022, officers from the Drug Enforcement Administration and San Francisco Police Department arrested the defendant, Melvin Diaz, and seized more than 26 pounds of narcotics—including *more than 18 pounds of fentanyl*—as part of a coordinated operation involving the search of several different locations in the East Bay tied to Mr. Diaz and a co-conspirator. The defendant presently is charged with one count of distribution and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii), in connection with the sale of three ounces of methamphetamine to an undercover officer on September 20, 2022. *See* Dkt. 1. That the defendant is not yet charged with a more serious offense—for example, possession with intent to distribute A-weight fentanyl, A-weight heroin, and/or A-weight cocaine base, each of which he possessed when he was

arrested on November 16, 2022—is only because the grand jury has not convened since that date. Indeed, the defendant and his co-conspirator possessed 8,346.3 grams (18.4 pounds) of fentanyl on the day they were arrested. That is almost *21 times* the amount required for A weight. *See* 21 U.S.C. § 841(b)(1)(A)(vi). Officers also seized two semi-automatic handguns, ammunition, and more than $50,000 in cash when they arrested the defendant and his co-conspirator last week.

The defendant is charged in this case with a narcotics offense, but he also has a history of violence. In November 2021, the defendant beat an elderly man unconscious on the streets of San Francisco after the man tried to intervene as the defendant was assaulting a teenage girl. The defendant shoved the elderly man to the pavement, broke his arm, and repeatedly kicked him in the head, causing bleeding on the brain. The defendant's April 2022 misdemeanor conviction for that offense belies its seriousness, which is readily apparent from the police reports—and from the fact that the defendant served six months in custody upon conviction (a rarity in San Francisco). Nor does that conviction represent the only violent conduct in the defendant's past: in April 2018 he was accused of brandishing a knife at a passerby whose companion had declined to purchase narcotics from the defendant.

The defendant is a citizen of Honduras with few connections to the Bay Area, beyond it being his preferred location to sell drugs. He is a professional drug dealer who has been deported or removed from the United States at least twice, in July 2012 and May 2017. He has no legitimate employment and he has never before faced federal prosecution—let alone stared down a charge that carries a stiff mandatory minimum sentence like the one he confronts here—and he has little incentive to remain in the area to see this case through. To assure the defendant's appearance in court and the safety of the community, the government respectfully requests that the Court order the defendant detained pending trial.

## II.     FACTUAL BACKGROUND

### A.     Mr. Diaz Repeatedly Sold Significant Quantities of Fentanyl and Methamphetamine to an Undercover Officer in September and October 2022

In September 2022, not long after Mr. Diaz was released from custody after his April 2022 conviction, officers of the Drug Enforcement Administration ("DEA") and San Francisco Police Department ("SFPD") initiated an investigation into the defendant's narcotics trafficking activities in the Tenderloin District of San Francisco. The defendant was, by then, well known to law enforcement:

SFPD officers had arrested him at least six times for narcotics-related offenses between 2012 and 2021.

On four separate occasions over the course of just three weeks, from September 16, 2022, to October 5, 2022, the defendant sold—and, in one case, coordinated the sale of—fentanyl and methamphetamine to an undercover SFPD officer ("UC"):

- On **September 16, 2022**, the UC made contact with the defendant in the Tenderloin, on Hyde Street between Ellis and Eddy Streets, where the defendant sold approximately one ounce of fentanyl to the UC for $500. To facilitate future transactions, the defendant gave the UC his cellphone number and told the UC to text him when he needed more drugs.

- On **September 20, 2022**, the UC texted the defendant to arrange a purchase of three ounces of methamphetamine. The defendant told the UC to meet him at 700 Geary Street in the Tenderloin because "its calmer with the police there." When the UC arrived on Geary Street, the defendant sold him approximately three ounces of methamphetamine for $700. Officers captured this transaction on video.

- On **September 24, 2022**, the UC texted the defendant around noon to arrange another purchase of narcotics. The defendant initially deflected, telling the UC "Im work in the night time bro" and asking the UC "Can you wait to the night?" But when the UC said he needed two ounces of fentanyl urgently and could meet the defendant anywhere, the defendant instructed the UC to meet him in the 2300 block of 109th Avenue in Oakland and said the price would be $1,000. When the UC arrived, he texted the defendant, who told the UC that his cousin would do the deal in his stead. Shortly thereafter, an unknown man riding a bicycle approached the UC's car and sold the UC approximately two ounces of fentanyl for $1,000. Officers captured this transaction on video.

- On **October 5, 2022**, the UC texted the defendant to arrange a purchase of two ounces each of fentanyl and methamphetamine. The defendant instructed the UC to meet him in Richmond, California. When the UC arrived at the pre-determined location, he texted the defendant, who showed up soon thereafter and sold the UC two ounces each of fentanyl and methamphetamine for a total of $1,500. Officers captured this transaction on video.

**B.   Before He Was Arrested, Mr. Diaz Sold Drugs in the Tenderloin on a Nightly Basis, and Used a Stash House in Berkeley to Store Those Drugs**

During the course of their investigation, DEA and SFPD officers came to learn—first via cell site location data associated with the cellphone whose number the defendant had given to the UC on September 16, 2022, and subsequently via video footage obtained from a camera attached to a nearby utility pole—that the defendant appeared to reside at an address on Peach Street in Oakland. DEA and SFPD officers also learned via cell site location data associated with the defendant's cellphone that the defendant traveled from his residence in Oakland to the Tenderloin and back on a nightly or near-nightly basis in October and November 2022,[1] and that (again on a nightly or near-nightly basis) the defendant stopped for a brief period at a location in North Oakland or Berkeley both before traveling to the Tenderloin and after leaving the Tenderloin but before returning to his residence in Oakland. Based on these patterns, the DEA and SFPD came to believe the location in North Oakland or Berkeley was a stash house where the defendant was storing the narcotics he sold in the Tenderloin.

Beginning on or around October 26, 2022, and lasting until on or around November 9, 2022, DEA and SFPD officers conducted periodic physical surveillance of the defendant from the time he left his residence on Peach Street in Oakland until the time he arrived in San Francisco.

On October 26, 2022, DEA and SFPD officers followed the defendant as he left his residence on Peach Street in Oakland at around 6:30 p.m. and drove to the area of the intersection of School Street and Maple Avenue in Oakland. When the defendant arrived at that location, he stopped his car and another man who had been standing on the street and appeared to be waiting for someone got into the passenger seat before the two men drove away.

On October 27, 2022, DEA and SFPD officers followed the defendant as he left his residence on Peach Street in Oakland at around 8:30 p.m. and again drove to the area of the intersection of School Street and Maple Avenue in Oakland, where he again picked up a waiting man—the same man the defendant had picked up the day before. Officers continued following the car as the defendant and his

---

[1] Indeed, cell site location data reflects that the defendant traveled from the East Bay to San Francisco *every night* between October 13, 2022, and November 11, 2022—that is, every night that law enforcement officers were tracking the location of his cellphone. And as described in more detail herein, officers conducting periodic physical surveillance of the defendant observed him and his co-conspirator working together to sell drugs on the streets of the Tenderloin several times during that window.

UNITED STATES' DETENTION MEMORANDUM     4
3:22-MJ-71287 MAG

co-conspirator drove from Oakland to 2130 Ashby Avenue in Berkeley, California, where they parked in a parking lot adjacent to an apartment building. At about 9:05 p.m., officers watched as the defendant and his co-conspirator got out of the defendant's car and entered an apartment in the building at 2130 Ashby Avenue. Five minutes later, officers observed the defendant and his co-conspirator leave the apartment building and walk toward the street, where they got into what appeared to be a waiting Uber. Officers then followed the Uber to San Francisco, where it dropped the two men off at the corner of Hyde and O'Farrell Streets in the Tenderloin. The two men then walked to the east side of Hyde Street between Ellis and Eddy Streets—the same area where officers had previously observed the defendant sell narcotics and where the UC purchased fentanyl from the defendant on September 16, 2022.

On November 1, 2022, officers set up surveillance at 2130 Ashby Avenue in Berkeley. At about 8:55 p.m., they observed the defendant's car arrive and park in the parking lot adjacent to the apartment building at that address. The defendant and his co-conspirator got out of the car, and the co-conspirator went inside Apartment #8 while the defendant waited outside. About five minutes later, the defendant's co-conspirator left Apartment #8 carrying a black backpack that he had not had on him when he entered the apartment. Officers then observed the defendant and his co-conspirator walk to the street and get into a waiting Uber, which the officers followed to San Francisco. The two men got out of the Uber at the corner of Hyde and O'Farrell Streets and walked to the east side of Hyde Street between Ellis and Eddy Streets, just as they had on October 27, 2022.

On November 2, 2022, at about 5:35 p.m., SFPD and DEA officers surveilling the area of the intersection of School Street and Maple Avenue in Oakland observed the defendant's co-conspirator leave an apartment building located at 3211 School Street. The man scanned the street and walked away from the building, at which time the officers drove to Peach Street to resume their surveillance of the defendant. At about 7:00 p.m., the defendant left his residence on Peach Street in Oakland and drove straight to the apartment building at 2130 Ashby Avenue in Berkeley. When the defendant (and the officers following him) arrived at 2130 Ashby Avenue, the lights were on inside Apartment #8. The defendant parked, got out of his car, and went inside Apartment #8 at about 7:25 p.m. A little more than an hour later, officers observed the lights inside Apartment #8 go out, at which point both the defendant and his co-conspirator walked out and toward the street. The other man was again carrying a black

backpack and he and the defendant again got into what appeared to be a waiting Uber. Officers followed the Uber to San Francisco, where it dropped the two men off at the corner of Hyde and O'Farrell Streets. Beginning at about 9:35 p.m., officers stationed in the Tenderloin observed the defendant and his co-conspirator work together to sell drugs on or around Hyde Street between Ellis and Eddy Streets.

On November 9, 2022, DEA and SFPD officers observed the defendant leave his residence on Peach Street in Oakland at about 8:10 p.m. Officers followed the defendant as he drove to the area of 3211 School Street, where he had previously picked up his co-conspirator. When the defendant arrived at 3211 School Street, officers observed his co-conspirator leave the only apartment on the ground level of the apartment building and get into the defendant's car. The two men then drove to 2130 Ashby Avenue, where they arrived around 8:30 p.m. After the defendant parked in the parking lot, his co-conspirator went inside Apartment #8 and turned on the lights while the defendant waited outside. About 10 minutes later, officers saw the lights inside Apartment #8 go out and watched as the defendant's co-conspirator left the apartment wearing a black backpack that he had not had on him when he went inside. Shortly thereafter, officers observed both men get into what appeared to be a waiting Uber, which officers followed to San Francisco. At about 9:05 p.m., the two men got out of the Uber at the corner of Post and Hyde Streets. Officers then observed the defendant's co-conspirator retrieve a digital scale and a large bag containing what appeared to be fentanyl from his backpack. Officers subsequently watched as the defendant's co-conspirator retrieved small bags of what appeared to be narcotics from the backpack and hand them to the defendant.

### C. Officers Seized More Than 26 Pounds of Drugs—Including Nearly 18.5 Pounds of Fentanyl—When They Arrested Mr. Diaz and a Co-Conspirator

On November 16, 2022, DEA and SFPD officers followed the defendant as he drove from his residence on Peach Street in Oakland to the suspected stash house at 2130 Ashby Avenue in Berkeley. Not long after the defendant arrived, officers observed the defendant's co-conspirator exit Apartment #8 and walk toward the defendant's car; he was wearing a black backpack. Officers converged on the car, arrested the defendant pursuant to a warrant signed by this Court, and detained the defendant's co-conspirator, seizing his backpack. Inside the backpack, officers found nearly four pounds of suspected narcotics in various quantities: 987.3 grams of fentanyl; 356.2 grams of heroin; 201.7 grams of powder

cocaine; 152.1 grams of crack cocaine; 28.3 grams of methamphetamine; and 20.5 grams of suspected alprazolam (also known as Xanax) and oxycodone pills.[2]

After arresting the defendant and detaining his co-conspirator, officers entered Apartment #8 with keys seized from the defendant's co-conspirator and pursuant to a warrant signed by this Court. Inside, officers found nearly 21 pounds of suspected narcotics, including: 6,685.7 grams (14.7 pounds) of fentanyl; 913.8 grams of suspected oxycodone pills; 733.0 grams of powder cocaine; 688.1 grams of heroin; and 463.9 grams of crack cocaine[3]:



Officers also found two semi-automatic handguns, a loaded high-capacity magazine, various indicia of drug trafficking—*e.g.*, cutting agents and a large metal press commonly used to prepare fentanyl for sale—and $1,500 in cash. There was no furniture or other indicia of occupancy in Apartment #8.

---

[2] Officers did not conduct field tests on the Xanax or oxycodone pills found in the backpack. However, officers did use a TruNarc Analyzer to conduct field tests on the fentanyl, heroin, powder cocaine, crack cocaine, and methamphetamine, all of which tested positive for those substances.

[3] Officers did not conduct a field test on the oxycodone pills found in Apartment #8. However, officers did use a TruNarc Analyzer to conduct field tests on the fentanyl, heroin, powder cocaine, and crack cocaine, all of which tested positive for those substances. It bears noting that many of the purported oxycodone pills seized in the Tenderloin turn out to contain fentanyl—a cruel bait and switch that endangers drug users who think they are buying one drug, but who are really buying a different, more deadly (and very addictive) drug.

Officers also searched two other locations in connection with the arrest of the defendant and his co-conspirator: the defendant's residence on Peach Street in Oakland and his co-conspirator's residence on School Street, also in Oakland. At the defendant's residence on Peach Street, officers found $41,925 in shrink-wrapped cash in the defendant's bedroom. They also found (among other occupants) the unknown man the defendant had described as his cousin and who the defendant sent to sell two ounces of fentanyl to the UC on September 24, 2022. At the defendant's co-conspirator's residence on School Street, officers found two men, one of whom was in the bathroom trying to flush drugs down the toilet.[4] Notwithstanding that man's efforts to destroy evidence, officers seized 673.3 grams of fentanyl, 30.1 grams of cocaine salts (powder), 19.1 grams of methamphetamine, 10.4 grams of heroin, and 7.8 grams of cocaine base (crack), as well as $6,661 in cash, from the residence on School Street.

All told, officers seized (among other things) more than 26 pounds of drugs—including more than 18 pounds of fentanyl—as well as two firearms, ammunition, drug trafficking materials (e.g., scales, packaging materials, cutting agents, and a hydraulic press), and $50,086 in cash:

| Drug Type | Drug Weight (g) | | | | Drug Weight (lbs) |
|---|---|---|---|---|---|
| | Backpack | Stash House | School Street | TOTAL | TOTAL |
| Fentanyl | 987.3 | 6,685.7 | 673.3 | 8,346.30 | 18.40 |
| Heroin | 356.2 | 688.1 | 10.4 | 1,054.70 | 2.33 |
| Cocaine base [crack] | 152.1 | 463.9 | 7.8 | 623.80 | 1.38 |
| Cocaine salt [powder] | 201.7 | 733.0 | 30.1 | 964.80 | 2.13 |
| Meth | 28.3 | | 19.1 | 47.40 | 0.10 |
| Oxycodone | 4.8 | 913.8 | | 918.60 | 2.03 |
| Xanax | 15.7 | | | 15.70 | 0.03 |
| TOTAL | 1,746.1 | 9,484.5 | 740.7 | 11,971.3 | 26.4 |

### III.   LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight

---

[4] This individual is on supervised release after a 2021 conviction for conspiring to distribute and possess with intent to distribute methamphetamine, heroin, and crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(C), in Case No. 3:19-cr-00367 CRB.

risk; the government need not prove that both factors are present. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *See id.*

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *See id.* Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *See id.*

Where (as here) there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in prison or more, courts apply a rebuttable presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production then shifts to the defendant. *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id.* (further stating that such an approach would "render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason" (emphasis added)). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See United States v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met. Those factors are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence

UNITED STATES' DETENTION MEMORANDUM     9
3:22-MJ-71287 MAG

against the defendant; (iii) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## IV.     ARGUMENT

### A.     Mr. Diaz Is Subject to a Rebuttable Presumption in Favor of Detention

The Complaint on file in this case charges the defendant with a single violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(viii), which carries a statutory maximum penalty of 40 years in prison.[5] As such, the defendant is subject to a rebuttable presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(A). To overcome this presumption, the defendant must show that he is not a flight risk *and* that his release will not endanger the community. He cannot do so.

### B.     Mr. Diaz Cannot Rebut the Presumption That He Is a Danger to the Community

At the time of his arrest in November 2022, the defendant and his co-conspirator possessed a staggering quantity of narcotics—including more than 18 pounds of fentanyl, a drug that is ravaging residents of the Bay Area (and nationwide). That came after the defendant sold significant quantities of fentanyl and methamphetamine to an undercover officer in September and October 2022 (and after a slew of prior narcotics-related arrests in San Francisco). The defendant's "continuing involvement with the distribution of drugs" militates in favor of detention. *United States v. Wolf*, 2015 WL 4573039, at *3 (N.D. Cal. July 29, 2015); *United States v. Fulgham*, 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) ("The Senate Report states: The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the safety of any other person or the community. Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to

---

[5] Notwithstanding the single charge in the Complaint, the government submits not only that the Complaint establishes probable cause that the defendant committed *several* violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B) in September and October 2022, but also that there is probable cause to believe the defendant was in violation of at least one more serious offense—that is, 21 U.S.C. § 841(a)(1) and (b)(1)(A)—when he was arrested on November 16, 2022.

UNITED STATES' DETENTION MEMORANDUM     10
3:22-MJ-71287 MAG

the community." (quotation marks and citation omitted)).

What is more, officers searching the defendant's stash house in Berkeley also found two semi-automatic handguns and ammunition, evincing a willingness on the part of the defendant and his co-conspirator to use violence (or at least the threat of violence) to further their drug trafficking activities. And the defendant has a violent past: in November 2021, he beat an elderly man unconscious on the streets of San Francisco after the man tried to intervene as the defendant was assaulting a teenage girl. The defendant's misdemeanor conviction for the offense—in which he broke the elderly man's arm and repeatedly kicked the man in the head, causing bleeding on the brain—belies the seriousness of his conduct, which is readily apparent from the relevant police reports. That incident followed one in April 2018 in which the defendant threatened a passerby with a knife after the passerby's companion dared to decline the defendant's offer to sell her narcotics. The defendant's violent past—not to mention his dangerous drug trafficking activities—establishes that the only way to safeguard the community from the defendant is to detain him pending trial.

### C. The Defendant Presents a Significant Flight Risk

The defendant is a citizen of Honduras. He has been deported or removed there from the United States at least twice, in July 2012 and May 2017. He has no job in the Bay Area (other than being a drug dealer). The defendant has never faced a charge of this magnitude—let alone a charge under 21 U.S.C. § 841(a)(1) and (b)(1)(A), which carries a 10-year mandatory minimum sentence and a statutory maximum sentence of life imprisonment—and has little incentive to stick around to see this case to its conclusion. There is no reason to think the defendant will appear for these federal proceedings if the Court releases him.

In consideration of all the circumstances—including the nature and circumstances of this offense, the overwhelming weight of the evidence against him, his violent background (and his possession of firearms in this case), the potentially significant sentence he faces if convicted (up to life imprisonment, and a 10-year mandatory minimum, once he is indicted on A-weight), and his scant connections to the Bay Area—there is a substantial risk that the defendant will refuse to abide by any court-ordered conditions of release and flee.

## V. CONCLUSION

There are no set of conditions that will reasonably assure the appearance of the defendant at court proceedings or ensure the safety of the community. The Court should order the defendant detained pending trial.

DATED:  November 21, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

 /s/ Nicholas M. Parker
NICHOLAS M. PARKER
Assistant United States Attorney